UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
DIVENCHY EDWARDS,                                           :
                                                            :
                              Plaintiff,                    :
                                                            :   **MEMORANDUM**
              - against -                                   :   **DECISION AND ORDER**
                                                            :
NEW YORK STATE OFFICE OF MENTAL                             :   16 Civ. 1397 (BMC)
HEALTH, ALTHEA JACKSON, and                                 :
HARRY JAMES HALL,                                           :
                                                            :
                              Defendants.                   :
                                                            :
                                                            :
----------------------------------------------------------- X
**COGAN**, District Judge.

      Plaintiff, currently a Maintenance Assistant for the Long Island Revitalization ("Revite") Program, which, among other things, provides maintenance services to the New York State Office of Mental Health ("OMH"), has brought claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the New York State Human Rights Law, N.Y. Exec. Law §§ 290-301 ("NYSHRL"), against OMH, Creedmoor Psychiatric Center ("Creedmoor") supervisor Althea Jackson, and Creedmoor supervisor Harry James Hall. Plaintiff's causes of action include allegations of discrimination, a hostile work environment, and retaliation based on his religion as a Born Again Christian, and for filing a complaint with the Equal Employment Opportunity Commission ("EEOC"). Defendants have moved for summary judgment as to all claims, and for the reasons stated below, I grant defendants' motion.

## BACKGROUND

      The following undisputed facts are from the parties' Local Rule 56.1 Statements, construed most favorably to plaintiff.

Plaintiff's first employment with OMH began in February 2011 as a laborer in the Long Island Revite Program. The Revite Program hires teams of laborers, maintenance assistants, and general mechanics that travel throughout New York State to assist OMH psychiatric centers with maintenance tasks, which are necessary to OMH's ability to maintain its accreditation. Revite Program teams service each hospital every six months for two- to three-week periods at a time. The Long Island Revite Team services certain psychiatric hospitals, including Creedmoor. Plaintiff worked at Creedmoor several times in his capacity as a laborer on the Long Island Revite Team.

Sometime in 2014, Creedmoor had an open position in which it would directly employ a cleaner at its facility. (Apparently, OMH both uses Revite and has its own employees to do maintenance.) Garland Ward, a supervisor at Creedmoor, notified plaintiff about the open position and recommended plaintiff to the Creedmoor housekeeping department and Jim Hall, who oversees all personnel in cleaning services. Subsequent to his applying for the position, plaintiff received an offer for full-time employment at Creedmoor as a cleaner, as did Steve Miles, a fellow Revite Team co-worker.

Plaintiff began as a probationary employee on August 7, 2014. As a probationary employee, plaintiff knew that he could be terminated if he did not do his job correctly or if there were staff complaints about his work. As a cleaner, plaintiff's cleaning responsibilities included stripping and polishing floors, window washing, vacuuming, trash removal, dusting and cleaning walls, common areas, hospital rooms, and bathrooms. The cleaning assignments ranged between light, medium, and heavy physical effort. Plaintiff's direct supervisors at Creedmoor were Derrick Mullings and Garland Ward, who were, in turn, supervised by defendants Althea

Jackson and Harry James Hall.[1]  Mullings and Ward inspected plaintiff's ward on at least a daily basis.

As to defendant Hall, his title is Chief Housekeeper 2 and his responsibilities include oversight over all personnel in the Support Services department, which itself includes housekeeping supervisors and cleaners.  Hall also oversees Jackson, who is currently Chief Housekeeper 1 and the part-time Employment Assistance Program Coordinator.  Mullings is a Supervising Housekeeper and is responsible for overseeing housekeepers and cleaners, including newly hired cleaners during their one-year probationary periods.  Mullings trained plaintiff during his first two weeks at Creedmoor.

Plaintiff was initially assigned to clean Ward 6B.  He performed satisfactorily during his first probationary period, which began in August 2014 when he started, going through November 2014.  The second probationary period, which went from December 2014 to February 2015, also yielded a satisfactory evaluation, but plaintiff was warned during this period that he needed to increase the volume of his work by working more quickly, complete all of his assignments, and clean the ward as he was trained to do.  Toward the end of March, Mullings asked Jackson to observe plaintiff's performance, and Jackson reported the following:  the ward smelled; the corridor and bedroom floors were not swept or mopped and needed buffing; the bathrooms were not cleaned, and there were feces on the toilet seats, on the wall, and under the toilet paper dispensers; and the shower needed scrubbing and mildew removed.  Plaintiff disputes that this was the case; instead, he states that Jackson was over-scrutinizing his work.

In any event, plaintiff's supervisors transferred plaintiff to Ward 6A.  In mid-April, Jackson again observed that plaintiff was not performing his duties, this time in Ward 6A, and

---

[1] Plaintiff denies this supervisory scheme, but then in his supplemental statements of facts, states that his direct supervisors were Mullings, Ward, and another individual, Robert Means, and that the three were supervised by Jackson and Hall.  Defendants dispute Means' position, stating that he was not a direct supervisor.

3

that his work had not improved. Hall had one or two conversations with plaintiff's direct supervisors about whether or not plaintiff should pass probation. In early May, Hall, Jackson, Mullings, and Ward met to discuss whether to recommend terminating plaintiff. They decided that, because plaintiff was still working too slowly and not cleaning thoroughly even after his transfer to Ward 6A, they would terminate him. Shortly thereafter, plaintiff received his third and final probationary report, which was unsatisfactory. Plaintiff was terminated that same day.

On the day following his termination, plaintiff applied for a position with his former employer, the OMH Long Island Revite Program. At the end of May, plaintiff was rehired as a Maintenance Assistant, G-9, for the Long Island Revite Team, under the supervision of Barbara Daros and Pierre Yacinthe.

On June 29, 2015, plaintiff filed a complaint with the EEOC against Creedmoor. Plaintiff alleged religious discrimination and hostile work environment on the basis of his faith as a Born Again Christian. Plaintiff had told several people at Creedmoor about his beliefs, including one brief conversation with Hall where he told Hall that he worked to please God and Hall said he did not want to hear about that, and another conversation with Jackson. In that conversation, Jackson told plaintiff that she is a pastor and he replied that he is a minister. Plaintiff also advised Jackson in that conversation that he believes that everyone who follows the gospel is a minister. Plaintiff believes, based on her facial expression, that Jackson disagreed with him.

Plaintiff and Jackson had another conversation about religion after plaintiff, citing his religious beliefs, declined to contribute to a collection for an employee whose father had died. In response to plaintiff's declination, Jackson shared with him a portion of scripture that dealt with

4

giving, and during a conversation about that scripture passage, Jackson and plaintiff discussed the meaning of the Biblical verse.

That was the last conversation plaintiff had with Jackson about religion. Plaintiff never told anyone about either conversation he had with Jackson. However, it was after these two conversations that (1) Jackson began to heavily scrutinize his work and (2) Mullings, Hall, and Jackson inspected his ward more frequently.

Hall would visit plaintiff's ward on the weekends, even though those were Hall's days off. After the conversations with Jackson, an individual, Gordon, who previously assisted plaintiff with moving the beds, no longer assisted plaintiff with that task. In March 2015, Mullings stopped spraying the bathroom every week, an act that had facilitated plaintiff's ability to clean the bathrooms. Plaintiff attempted to complain about Mullings to Jackson and Hall, but both dismissed him out of hand.[2]

In his EEOC complaint and in the present action, plaintiff alleges religious animus based on comments by his direct supervisor Ward, namely, Ward's handful of references to plaintiff as "Rev," short for "Reverend." Plaintiff never complained or said anything to anyone about Ward calling him "Rev," nor did he ever complain to anyone at Creedmoor about religious discrimination. Furthermore, plaintiff testified that he did not know what Ward intended when he called plaintiff "Rev."

The timing is unclear, but plaintiff also claims that Miles, the fellow Revite Team employee who was also hired by Creedmoor, and who was not a Born Again Christian, was

---

[2] Plaintiff offers a litany of inadmissible hearsay statements from various named and unnamed Creedmoor employees regarding what was considered ordinary or enhanced scrutiny at Creedmoor. This hearsay is excluded from the Court's resolution of the motion.

5

treated differently than plaintiff; Miles would show up late or not at all on several occasions and would sometimes show up to work drunk, but was never terminated.

Despite his termination from Creedmoor, plaintiff returned to work at Creedmoor as a member of the Revite Team in mid-July 2015, working there in July and August 2015. Prior to plaintiff's tour of duty at Creedmoor as part of Revite, a routine pre-assessment meeting was held, and present were Yacinthe and Daros from Revite and Hall, among others, from Creedmoor. Hall was aware that plaintiff was once again working for Revite and suggested that plaintiff work on the painting side of the team, so that there would be no direct contact between plaintiff and Hall or the other supervisors involved in his termination. Yacinthe and Daros said they would consider Hall's suggestion, but they did not think there was anything they could do about plaintiff's assignment.

There was no change in plaintiff's position, location, or supervisory responsibilities. Plaintiff was able to enter Creedmoor when he returned as part of the Revite Team. Plaintiff would again return to Creedmoor with the Revite Team in February 2016. Although neither Hall nor Jackson controlled or supervised plaintiff's work for Revite during his tours at Creedmoor, nevertheless, plaintiff considered Hall's conduct and tone angry or unpleasant during this time.

## DISCUSSION

"[S]ummary judgment may be granted only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," and "[i]n determining whether there is a genuine dispute as to a material fact, [the court] must resolve all ambiguities and draw all inferences against the moving party." Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 135 (2d Cir. 2013) (alteration, citations, and internal quotation marks omitted). In ruling on a motion for summary judgment, a district court "may rely on any material that would be

6

admissible at a trial." Lyons v. Lancer Ins. Co., 681 F.3d 50, 57 (2d Cir. 2012) (quotation marks omitted); see also Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Publ'g Corp., 635 F.3d 48, 52 (2d Cir. 2011) ("[T]he non-moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial . . . ." (internal quotation marks omitted)). A dispute is not "genuine" if no reasonable jury "could return a verdict for the nonmoving party." Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 45 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986))

Plaintiff alleges, pursuant to Title VII and the NYSHRL, causes of action for discrimination, hostile work environment, and retaliation based on his religion and for filing an EEOC complaint. Summary judgment is granted to defendants for the following reasons: (i) plaintiff's Title VII claims for discrimination, hostile work environment, and retaliation are meritless, and (ii) plaintiff's NYSHRL claims are barred by the Eleventh Amendment.

I. **Plaintiff's Title VII Claims Against OMH**

   A. **Discrimination**[3]

Discrimination claims under Title VII are governed by the familiar three-step burden-shifting test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). At step one, plaintiff must make out a *prima facie* case by showing that (1) he belongs to a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. See Gorzynski v. Jetblue Airways Corp., 596 F.3d 93 (2d Cir. 2010). The burden of making this showing is *de minimis*. See Joseph v. Leavitt, 465 F.3d 87 (2d Cir. 2006).

---

[3] Plaintiff's complaint also contains Title VII allegations against Hall and Jackson, but Title VII does not authorize lawsuits against individuals. See, e.g., Schiano v. Quality Payroll Sys., 445 F.3d 597, 608 n.8 (2d Cir. 2006) (citing Tomka v. Seiler Corp., 66 F.3d 1295, 1313-14 (2d Cir. 1995)). Plaintiff has conceded this point, and the Title VII claims against Jackson and Hall are dismissed.

Circumstances contributing to an inference of discrimination may include, among other things, invidious comments about people in the protected class or more favorable treatment of similarly situated employees outside of the protected class. See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001).

At step two, a defendant must "articulate some legitimate, nondiscriminatory reason for [his] action," but the defendant "need not persuade the court that it was actually motivated by the proffered reason." Delaney v. Bank of Am. Corp., 766 F.3d 163, 168 (2d Cir. 2014) (internal quotation marks omitted). If the defendant succeeds on step two, the presumption of discrimination is rebutted. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).

Then at step three, the burden shifts back to the plaintiff to show either pretext, or that a reasonable jury could conclude that the employer's determination was in fact the result of discrimination. See Holcomb v. Iona Coll., 521 F.3d 130, 141 (2d Cir. 2008). The evidence that should be considered at step three includes "the strength of the plaintiff's *prima facie* case" as well as "the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." James v. N.Y. Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-50 (2000)) (internal quotation marks omitted). In some cases, assessment of a plaintiff's *prima facie* case and his evidence of pretext "tend to collapse as a practical matter under the McDonnell Douglas framework." Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 n.1 (2d Cir. 2002).

Defendants argue that plaintiff has not even demonstrated a *prime facie* case of discrimination because plaintiff has not presented any facts sufficient to satisfy the fourth factor,

8

*i.e.*, that his termination occurred under circumstances that give rise to an inference of discrimination.

Regarding the comments about which plaintiff complains, "stray remarks, even if made by a decision maker, do not constitute sufficient evidence to make out a case of employment discrimination." Danzer v. Norden Sys., 151 F.3d 50, 56 (2d Cir. 1998). Ward's infrequent references to plaintiff as "Rev," short for Reverend, is not an invidious comment, particularly when considering that plaintiff believed himself to be a minister, that he told his colleagues of his faith, and particularly considering that plaintiff did not know how Ward intended the comment. It is illogical to admit not understanding how a comment is intended and then to argue that it is invidious. Related to this point is plaintiff's meritless argument regarding Hall's response when plaintiff stated that he works to please God: Hall stating that he did not want to discuss God or religion is insufficient to find an invidious comment.

Next, there can be no inference of discrimination based on a single facial expression during one conversation. In the first instance, it is a facial expression and not an invidious comment. The Court refuses to make the leap from a disagreeable facial expression to one that evinces discrimination against Born Again Christians. Even if the Court were to accept plaintiff's characterization of Jackson's expression as "nasty," that is insufficient: An "angry facial expression[]" will not permit a finding of discrimination because although this "behavior may be rude and unprofessional, it merely indicate[d] personal enmity [or here, disagreement] rather than discrimination." Wilson v. Family Dollar Stores of N.Y., Inc., No. 06-CV-639, 2008 WL 4426957, at *7-8 (E.D.N.Y. Sept. 25, 2008).

As to a comparator, the only person that plaintiff offers is his co-worker Steve Miles, who showed up to work late or not at all sometimes and at times was drunk at work, but was not

fired. To show that Miles is a relevant comparator to plaintiff, plaintiff must demonstrate that Miles was "similarly situated in all material respects" to plaintiff. McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001).

"Employment characteristics which can support a finding that two employees are similarly situated include similarities in education, seniority, performance, and specific work duties and similar requirements for skill, effort and responsibility for jobs performed under similar working conditions." Potash v. Fl. Union Free Sch. Dist., 972 F. Supp. 2d 557, 580 (S.D.N.Y. 2013) (internal quotation marks and citation omitted). Although plaintiff has offered very little evidence regarding Miles' characteristics, plaintiff has shown that both men were hired at the same time for the same job (and therefore had similar duties and responsibilities) to work at Creedmoor under the same working conditions. Plaintiff was terminated for alleged improper performance, and Miles was not fired even though he came to work late and drunk. The only other difference between them was that plaintiff is a Born Again Christian. Given the *de minimis* standard necessary to show a *prima facie* case, and construing the record in the light most favorable to plaintiff, these facts suffice, albeit barely.

Having met the first step of the McDonnell Douglas burden-shifting analysis, the burden shifts to defendants to show a legitimate, non-discriminatory reason for plaintiff's termination. Defendants have met step two by offering the declining quality of plaintiff's performance and his unsatisfactory performance rating on his third probationary performance review.

As to the third step of McDonnel Douglas, plaintiff has failed to rebut the legitimate, nondiscriminatory reasons for his termination. As stated above, the evidence that should be considered at step three includes "the strength of the plaintiff's *prima facie* case" as well as "the probative value of the proof that the employer's explanation is false, and any other evidence that

supports [or undermines] the employer's case." James, 233 F.3d at 156 (internal quotation marks omitted). Plaintiff's memorandum in opposition to defendants' motion for summary judgment spends one paragraph arguing pretext; specifically, he argues pretext because his "May 2015 termination occurred less than four months after he received a satisfactory probation report;" that "[f]ollowing the March 2015 conversations regarding religion, [he] failed to receive any supervisory and employee assistance for his job duties;" he "was blamed for deficiencies which occurred on his days off and heavily scrutinized by Jackson with regular visits to his [w]ard when same was never done prior." In essence, plaintiff relies on the same arguments he advanced for his *prima facie* showing, and he does not offer any arguments targeted to the performance reviews as pretext. That is permissible, and may create an issue of fact when the *prima facie* case is strong. Here, however, plaintiff's *prima facie* case is truly *de minimis*, and no reasonable jury could find that his religion was a substantial factor in the decision to terminate him.

In the first instance, plaintiff's previous satisfactory reviews do not undo the unsatisfactory review he received as a probationary employee, nor do they do undo the warnings he received prior to his unsatisfactory review: "Disagreements regarding poor performance evaluations and claims of prior good performance do not, as a matter of law or logic, mean that present poor performance reviews were unfounded." Mattera v. JPMorgan Chase Corp., 740 F. Supp. 2d 561, 574 (S.D.N.Y. 2010).

To the contrary, the facts plaintiff provides regarding the quality of his work support the conclusion that his performance declined. Plaintiff admits that defendants discussed his performance with him and that told him to work faster and more efficiently during his February 2015 second review, even though defendants graded his evaluation as "satisfactory." This is

important for two reasons. First, plaintiff admits that he received this warning, and he makes no argument disputing the veracity of this evaluation of his work performance, which precipitated his February 2015 warning. Second, and more importantly, these warnings came in February 2015, before the March 2015 conversations related to religion that he argues prompted the heightened scrutiny, absence of assistance, the May unsatisfactory review, and his May termination. This is fatal to plaintiff's argument because plaintiff is admitting that he was put on notice regarding his performance issues before the particular religious conversations he proffers as having caused his termination.

In addition, regarding his post-religious conversation work performance, he admits that he was not doing certain cleaning routines daily, either because he asserts that defendants did not require him to or because someone he expected to help him did not help him. In that way, plaintiff is still admitting that he failed to complete a task his supervisors had assigned him. His attempts to rationalize his non-performance support defendants' argument that he was not working up to their standards. See Ralkin v. New York City Transit Auth., 62 F. Supp. 2d 989, 998 (E.D.N.Y. 1999) (finding that "many of plaintiff's factual disputes appear to be rationalizations for her allegedly unsatisfactory performance, rather than demonstrations of any material fact to be tried"). Thus, plaintiff has failed to rebut defendants' legitimate, nondiscriminatory reasons for his termination as pretext.

### B. Hostile Work Environment

To raise a triable issue of fact as to a hostile work environment claim, a plaintiff must adduce evidence showing that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Rivera v. Rochester Genesee Reg'l

Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014) (internal quotation marks omitted). "It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs because of an employee's protected characteristic." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). Anti-discrimination laws "are intended to protect employees from genuine workplace mistreatment and harassment; they are not intended to guarantee that employees will never suffer inconveniences or that their every desire will be fulfilled." Ruggieri v. Harrington, 146 F. Supp. 2d 202, 218 (E.D.N.Y. 2001). Thus, "Title VII does not establish a 'general civility code' for the American workplace." Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004). In assessing a hostile work environment claim, "courts should examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." Rivera, 743 F.3d at 20.

Plaintiff's evidence in support of his hostile work environment claim for the most part replicates the evidence that he argues shows discriminatory animus. He also points to the increase in the number of inspections of his ward as evidence of a hostile work environment.[4] In sum, plaintiff, therefore, relies in large part on two conversations with Jackson, one conversation with Hall, and the instances where Ward called plaintiff "Rev," in addition to his being closely scrutinized. This fails to meet the standard for a hostile work environment.

Although plaintiff argues that the test for a hostile work environment is disjunctive in that it need be either pervasive or severe, not both, plaintiff has shown neither pervasiveness nor severity. The facts of this case are a far cry from a situation in which plaintiff was subjected to discriminatory harassment because he was "singled out . . . on an almost daily basis on account

---

[4] Plaintiff additionally offers several inadmissible hearsay statements regarding Jackson's historical inspection frequency or conversations others had with Jackson about plaintiff, relayed to him by named and unnamed third persons. None of these statements would be admissible at trial, and the Court will not consider them.

13

of" a protected characteristic, that would qualify as pervasive, see, e.g., Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004), or the kinds of cases indicating single but egregious hostility, see, e.g., Howley v. Town of Stratford, 217 F.3d 141, 148 (2d Cir. 2000) (denying summary judgment where plaintiff had been subjected to "an extended barrage of obscene verbal abuse," including profanity, "remarks concerning [her] menstrual cycle," and suggestions plaintiff had "achieved her [advancement] only by performing sexual favors").

Courts have routinely held that actual or perceived mistreatment similar to that relied on by plaintiff in this case falls significantly short of a hostile work environment. See Demoret v. Zegarelli, 451 F.3d 140, 150 (2d Cir. 2006) (finding that "close monitoring of [the plaintiff's] work" and fact that the employer "review[ed] her budget with a fine-toothed comb" were not actionable); Petrosino, 385 F.3d at 223 ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment."). Plaintiff's evidence does not rise to the level of a hostile work environment.

### C. Retaliation

Retaliation is actionable under Title VII when the plaintiff "engaged in a protected activity, such as complaining about [religious] discrimination" and, as a result, his employer took an adverse action in retaliation. Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse [retaliatory] action; and (4) a causal connection between the protected activity and the adverse employment action." Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (quoting Jute v. Hamilton Sunstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)).

14

Plaintiff's claim fails to make out a *prima facie* case because he has failed to show an adverse action. To demonstrate an adverse action, "'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 721 (2d Cir. 2010) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

First, plaintiff filed his EEOC complaint after his termination from Creedmoor, and plaintiff admitted that he never complained to anyone during his time at Creedmoor about any of the conversations or comments that he now claims were discriminatory. Since he was no longer employed by Creedmoor subsequent to his EEOC complaint, there is no protected activity as to which defendants could retaliate. Instead, plaintiff argues that defendants tried to affect his employment by having him, as a member of the Revite Team, prohibited from Creedmoor.

That is an inaccurate characterization of the admissible facts provided to the Court. What transpired, as both parties admit, was that prior to plaintiff's first tour of duty at Creedmoor as part of Revite, a routine pre-assessment meeting was held. During that meeting, the Revite supervisors Yacinthe and Daros attended, as did Hall. Hall was aware that plaintiff was once again working for Revite and suggested that plaintiff work on the painting side of the team, so that there would be no direct contact between plaintiff and Hall or the other supervisors involved in his termination. Yacinthe and Daros said they would consider Hall's suggestion, but they did not think there was anything they could do about plaintiff's assignment.

Plaintiff's tours of duty and assignments did not change; as the evidence shows, and plaintiff admits, he has done two tours of duty at Creedmoor as part of the Revite Program, and he has not been prohibited from entering the facility. Although courts in this circuit have

15

recognized that "[a] plaintiff can state a claim for retaliation where a previous employer gives a negative job reference, refuses to write a recommendation, or otherwise sullies her reputation, thereby damaging the employee's future employment prospects," Blutreich v. N. Shore-Long Island Jewish Health Sys., Inc., No. 13-CV-8583, 2015 WL 1515255, at *4 (S.D.N.Y. Apr. 2, 2015), that is not what happened here. Cf. Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 178 (2d Cir. 2005) (holding that a former employer's false statement to a *prospective* employer that he could not discuss the plaintiff because she "had a lawsuit pending," was sufficient for a reasonable jury to conclude that plaintiff was the victim of a retaliatory reference). No one at Creedmoor provided a prospective employer a negative job reference, refused to write a recommendation, or otherwise damaged plaintiff's future employment prospects with Revite. Revite had already hired plaintiff, and Revite assigned him to Creedmoor, where he stayed.

Thus, plaintiff has not shown any material adversity. Material adversity "means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 57. Plaintiff has not shown any action that harmed plaintiff, whether materially or at all, and Hall's suggestion that plaintiff work on the painting side is not sufficient to deter a reasonable employee from complaining about discrimination. Accordingly, while plaintiff's burden to show retaliation at the *prima facie* stage is *de minimis*, plaintiff has failed to meet even this modest burden. See Blutreich, 2015 WL 1515255, at *4.

The rest of his argument is premised on his allegations of Hall having a "nasty attitude" towards him or speaking with "anger in his voice" during those tours of duty. That is simply not enough to show an adverse action. The requirement of material adversity preserves the principle that Title VII "does not set forth a general civility code for the American workplace."

16

Burlington, 548 U.S. at 68 (internal quotation marks omitted). "[P]etty slights or minor annoyances that often take place at work and that all employees experience" do not constitute actionable retaliation. Id. Plaintiff's issue with Hall's attitude cannot demonstrate an adverse action given that Hall is not his employer or supervisor, the interactions, however uncivil, are limited to two occasions when plaintiff was at Creedmoor, and where Title VII does not guarantee a "civility code." Defendants' motion for summary judgment is granted as to plaintiff's Title VII retaliation claim.

## II. Eleventh Amendment

The Eleventh Amendment bars a suit against a state or one of its agencies for money damages in federal court unless either Congress has clearly abrogated the states' immunity or the state has unequivocally waived its immunity. See, e.g., Santiago v. N.Y.S. Dep't of Corr. Servs., 945 F.2d 25, 29-30 (2d Cir.1991). Here, as district courts in this circuit have uniformly found, the NYSHRL includes no waiver of the state's immunity to suit in federal court. See Limwongse v. N.Y.S. Office of Mental Health, 249 F. App'x 862, 862-63 (2d Cir. 2007) ("[W]e agree with the district court that, because [OMH] and [the psychiatric center] are state agencies, they are protected by Eleventh Amendment immunity from appellant's suit for monetary damages."); Dimps v. N.Y.S. Office of Mental Health, 777 F. Supp. 2d 659, 661 (S.D.N.Y. 2011) (holding that OMH and two of its psychiatric centers "are agencies of the State of New York" and "'arms of the state entitled to sovereign immunity,'" such that plaintiff's "NYSHRL claim must be dismissed"); Lambert v. N.Y.S. Office of Mental Health, No. 97-CV-1347, 2000 WL 574193, at *7 (E.D.N.Y. Apr. 24, 2000), aff'd, 22 F. App'x 71 (2d Cir. 2001) (listing cases).[5] Importantly, this Eleventh Amendment immunity extends to state employees acting in

---

[5] Plaintiff agreed to dismiss his NYSHRL claims against OMH during a pre-motion conference.

17

their official capacities.  See Pietri v. N.Y.S. Office of Court Admin., 936 F. Supp. 2d 120, 128 (E.D.N.Y. 2013) (citing Fulton v. Goord, 591 F.3d 37, 45 (2d Cir. 2009).

Here, plaintiff's allegations stem from Jackson's and Hall's conduct in their official capacity, *i.e.*, as his supervisors.[6]  Accordingly, plaintiff's NYSHRL claims against OMH, Jackson, and Hall are dismissed.

## CONCLUSION

Defendants' motion for summary judgment is granted.  The Clerk is directed to enter judgment dismissing the complaint.

**SO ORDERED.**

                                                    U.S.D.J.

Dated: Brooklyn, New York
       February 20, 2017

---

[6] Plaintiff relies on E.E.O.C. v. Suffolk Laundry Servs., Inc., 48 F. Supp. 3d 497, 523 (E.D.N.Y. 2014), for the proposition that the NYSHRL permits supervisor liability, but that case is inapposite, as the defendant in that case was a private actor.